## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## _____ DIVISION

FILED

2014 OCT 22  AM 8:02

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

|  |  |
|---|---|
| Kenneth Wilson | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| **Name of Plaintiff** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
|  | ) |
| Fisk University | ) |
|  | ) |
|  | ) |
|  | ) |
| **Name of Defendant(s)** | ) |

Case No. _____
**(To be assigned by Clerk)**
**Jury Demand** ☑ Yes ☐ No

## COMPLAINT UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, and the Civil Rights Act of 1991, for employment discrimination. Jurisdiction is specifically conferred upon the Court by 42 U.S.C. § 2000e-5, or, if the Plaintiff is a federal employee, by 42 U.S.C. § 2000e-16. Relief is sought under 42 U.S.C. § 2000e-5(g) and/or 42 U.S.C. § 1981a(b).

2. Plaintiff, _____Kenneth Wilson_____, is a citizen of the United States and resides at

| 534 Glengarry Drive | | | Nashville | |
|---|---|---|---|---|
| Street address | | | City | |
| Davidson | TN | 37217 | (615) 582-0718 | |
| County | State | Zip Code | Telephone Number | |

3. Defendant, _____Fisk University_____ resides at, or its business is located at

| 1000 17th Avenue North | | | Nashville |
|---|---|---|---|
| Street address | | | City |
| Davidson | TN | 37208 | |
| County | State | Zip Code | |

(If more than one Defendant, list the name and address of each additional Defendant)

_____

_____

_____

_____

_____ .

4. Plaintiff sought employment from the Defendant or was employed by the Defendant at

| 1000 17th Avenue North | | , | Nashville | , |
| Street address | | | City | |

| Davidson | , | TN | , | 37208 | . |
| County | | State | | Zip Code | |

5. Defendant discriminated against Plaintiff in the manner indicated in paragraphs 8 and 9 of this Complaint on or about  January                          3            2013           .
                                      Month          Day          Year

6. Plaintiff filed charges against the Defendant with the Tennessee Human Rights Commission or the Equal Employment Opportunity Commission charging the Defendant with the acts of discrimination indicated in paragraphs 8 and 9 of this Complaint on or about
   October                          31                          2013                          .
                Month          Day          Year

7. The Equal Employment Opportunity Commission or the United States Department of Justice issued a Notice of Right to Sue which was received by Plaintiff on  July
                                                                Month
      29     2014     , a copy of which Notice is attached.
      Day     Year

8. Because of Plaintiff's (1) _____X_____ race, (2) _____X_____ color, (3) ___X___ sex,

   (4) _____ religion, (5) _____ national origin, the Defendant:

a. _____ failed to employ Plaintiff.

b. __X__ terminated Plaintiff's employment.

c. _____ failed to promote Plaintiff.

d. _____ retaliated against Plaintiff for having filed a charge of discrimination.

e. _____ other. Explain: _____

9. The circumstances under which Defendant discriminated against Plaintiff were as follows:

PLEASE SEE ATTACHMENT 1

(You may use additional paper, if necessary.)

10. The acts set forth in paragraph 8 of this Complaint:

a. _____ are still being committed by Defendant.

b. _____ are no longer being committed by Defendant.

c. __X__ may still be being committed by Defendant.

11. Plaintiff attaches to this Complaint a copy of the charges filed with the Tennessee Human Rights Commission or the Equal Employment Opportunity Commission, which charges are submitted as a brief statement of the facts supporting this Complaint.

**WHEREFORE**, Plaintiff prays that the Court grant the following relief:

a._____ direct that Defendant employ Plaintiff, or

b._____ direct that Defendant re-employ Plaintiff, or

c._____ direct that Defendant promote Plaintiff, or

d.____X_____ order other equitable or injunctive relief: _____

Plaintiff's record cleared, a letter of recommendation and plaintiff will not be banned from campus
_____.

e.____X_____ direct that Defendant pay Plaintiff back pay in the amount of

$50,000
_____ and interest on back pay;

f.____X_____ direct that Defendant pay Plaintiff compensatory damages: Specify

the amount and basis for compensatory damages: _____

$50,000 Plaintiff suffered humiliation and embarrassment, shock and anger, and mental anguish
_____.

g.____X_____ direct that Defendant pay Plaintiff punitive damages in the amount of

$150,000
_____ because Defendant engaged in a discriminatory practice or

practices with malice or with reckless indifference to Plaintiff's federally protected rights,

as described in paragraphs 8 and 9 above; and that the Court grant such other relief as may

be appropriate, including costs and attorney's fees.

_____
(Signature of Plaintiff)

## ATTACHMENT 1

The Defendant employed the plaintiff on November 5, 2012 and discharged him on or about March 1, 2013. The plaintiff was employed as a security/patrol officer. During the term of his employment with the defendant, the plaintiff was subjected to a hostile work environment based on, among other things, his race (African-American) and his sex (male), as detailed more fully below. Further, the defendant's discharge was a pretext for its retaliation against the plaintiff based on complaints about a hostile work environment stemming from male-on-male sexual harassment of the plaintiff by a supervisor.

## HOSTILE WORK ENVIRONMENT BASED ON PLAINTIFF'S RACE

1. During the term of his employment, plaintiff initially worked on "third" shift. Plaintiff is African- American. He worked with two white officers, Jamie Binkley, a white female, and Timothy Wells, a white male. Commander Wells was plaintiff's immediate supervisor and was in a position of supervisory authority over both the plaintiff and Officer Binkley.

2. Plaintiff came to find out during the term of his employment, and while he was on third shift, that Wells and Binkley were engaged in a personal/romantic/sexual relationship.

3. On various occasions throughout late 012 and early 2013, Officer Binkley, called plaintiff and other African-Americans, including a blind black male and an elderly black female pedestrian, "black mother fucker" and used similar racial slurs. Officer Binkley used her romantic/personal/sexual relationship with Commander Wells to effectively immunize herself from any reprisals in the immediate chain of command within the Office of Campus Security.

4. After the plaintiff's termination, Officer Binkley made racial slurs to another black officer, Jeffrey Baker who was also working third shift. Commander Wells was present when the racial slurs were made.

5. Commander Wells' tolerance of and acquiescence in Officer Binkley's creation and maintenance of a hostile work environment based on plaintiff's race is attributable to the defendant and constituted an illegal hostile work environment, notwithstanding the defendant's status as a historically African-American institution.

6. As a result of the racially hostile work environment described above, plaintiff was humiliated, embarrassed, suffered mental anguish, and was otherwise damaged.

## HOSTILE WORK ENVIRONMENT BASED ON MALE-ON-MALE SEXUAL HARRASSMENT OF PLAINTIFF

7. In February, 2013, plaintiff requested a transfer to a different shift. Under this new shift, he would be under the direct supervision of Commander Steven Lopez.

8. One morning in February, 2013, plaintiff was invited to Commander Lopez's on-campus home to discuss his new working relationship with, and duties under the supervision of, Commander Lopez.

9. While at Commander Lopez house, Commander Lopez instructed the plaintiff to sit on a specific bar stool. Commander Lopez then told the plaintiff that he was in a sexual relationship

with, JaCenda Davidson, Fisk's Human Resource Director. The plaintiff told Commander Lopez that he didn't have to discuss his love life with him.

10. Commander Lopez then sat on a stool right next to the plaintiff. Commander Lopez started to make comments about how the plaintiff was a great officer and that he should apply for the open Supervisor position.

11. While telling the plaintiff this, Commander Lopez was patting the plaintiff on his right knee with his left hand. Commander Lopez then leaned forward slightly and started moving his hand toward the plaintiff's inner thigh, near his groin area. The plaintiff took his left elbow and moved Commander Lopez's hand away. The plaintiff told Commander Lopez that he was out of line.

12. The plaintiff then decided to change the subject by asking Commander Lopez about some war medals that were hanging on the wall. Commander Lopez then started talking about how he was trained when he was in the military to put people to sleep.

13. Commander Lopez told the plaintiff to approach him and act like the plaintiff was going to grab his "balls" (testicles) so he could put the plaintiff in a chokehold and put him to sleep. The plaintiff told Commander Lopez told that he didn't come over there to grab his "balls" or learn how to put people to sleep.

14. Shortly after, another Fisk officer, Sgt. Calvin London arrived still in his uniform. Sgt. Calvin London may have been still on duty. He began drinking with Commander Lopez and watching Commander playing with his gun with the laser on it. He noticed that the plaintiff was getting upset because Commander Lopez was pointing the gun at him showing off that it had a laser on it (the weapon was loaded). The plaintiff decided to leave. As the plaintiff walked toward

the door, Commander Lopez patted plaintiff on his buttocks. The plaintiff turned around and told Commander Lopez that he had a serious problem with his hands. As the plaintiff took another step out the door, Commander Lopez inappropriately reached under plaintiff's coat and rubbed the bottom part of plaintiff's buttocks, almost reaching his genitals. The plaintiff turned around and told Commander Lopez in a forceful way not to put his hands on him again and that he was sick person.

15. Sgt. London was standing in front of the apartment laughing. He clearly heard the plaintiff tell Commander Lopez not to touch him. The plaintiff told Sgt. London that Commander Lopez had grabbed his buttocks twice. As the plaintiff was leaving, he noticed that JaCenda Davidson, Fisk's Human Resource Director, was standing in the doorway of her apartment facing Commander Lopez's apartment.

16. Commander Lopez was not the plaintiff's supervisor at the time, yet he created a hostile work environment based on plaintiff's sex, engaging in male-on-male sexual harassment of plaintiff. Commander Lopez lured plaintiff into his on-campus home under the ruse that the two would be discussing work and plaintiff's duties under plaintiff's new shift. Commander Lopez attempted to take advantage of plaintiff, using the authority and on-campus housing provided to him by Fisk University in order to do so.

17. The actions of Commander Lopez described above are attributable to the defendant since Commander Lopez was in a supervisory capacity with respect to plaintiff.

18. As a result of Commander Lopez's actions, plaintiff was damaged, suffering humiliation and embarrassment, shock and anger, mental anguish, and other damages.

# RETALIATORY DISCHARGE

19. Plaintiff attempted to complain about the actions of Commander Lopez, as described above, to defendant's Department of Human Resources and others, but received no response.

20. The actions of Commander Lopez occurred in mid-February, 2013, and by the end of February, 2013, plaintiff was the subject of disciplinary action, including alleged counseling sessions and one written warning, which were allegedly based on student complaints. Plaintiff asserts that his treatment of students in these instances was justified and in accordance with the policies, procedures, and rules of Fisk University, yet he himself was criticized by his supervisors for upholding the rules of Fisk University.

21. During the above mentioned counseling session, the plaintiff was told by Commander Timothy Wells and Commander Lopez not to write up Fisk students if students were found drinking and using illegal drugs because their parent paid a lot of money for them to attend school and Fisk was having financial difficulty. Plaintiff asserts, believes, and alleges that the "discipline" he received was in fact a pretext for retaliation based on plaintiff's complaints about the harassment described above.

22. Plaintiff alleges that this retaliation included his termination from employment on or about March 1, 2013, and that the grounds given by defendant for that termination were pretextual.

23. The defendant alleged that the plaintiff broke into the offices of Fisk's Vice-President's and the Assistant-Chief's office to obtain complaints filed by students. Plaintiff asserts that these allegations are false. Video footage will prove that there was no break-in to the Vice-

President's office and the Assistant-Chief did not have a secure office. Witnesses' can confirm these facts.

24. As a result of plaintiff's wrongful termination, he has suffered damages, including but not limited to humiliation and embarrassment, mental anguish, shock, fright, anger, loss of earnings and benefits, the besmirching of his reputation, and being told that he can no longer set foot on the campus of Fisk University. Plaintiff asserts on information and belief that he has also been threatened by his former supervisor Commander Wells.

25. The plaintiff received information that Commander Wells stated that he would kill plaintiff if he sees him by stabbing him in the neck. Commander Wells was upset that plaintiff reported his illegal activities along with his co-worker, Officer Jaime Binkley, with whom Commander Wells had a romantic/personal/sexual relationship.

26. Plaintiff has complied with all conditions precedent to filing this action, including having received a right-to-sue letter from the Equal Employment Opportunity Commission issued on July 25, 2014.

27. Plaintiff has made reasonable attempts and taken reasonable steps to mitigate his damages.

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To:   **Kenneth Wilson**
      **649 Carmel Ave.**
      **Madison, TN 37115**

From:  **Nashville Area Office**
       **220 Athens Way**
       **Suite 350**
       **Nashville, TN 37228**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **494-2014-00126** | **Deborah K. Walker,**<br>**Supervisory Investigator** | **(615) 736-2109** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Sarah L. Smith_

**Sarah L. Smith,**
**Area Office Director**

JUL 25 2014

(Date Mailed)

Enclosures(s)

cc:   **William J. Haynes, Esq.**
      **Bone Mcallister Norton PLLC**
      **Nashville City Center**
      **Suite 1600**
      **511 Union Street**
      **Nashville, TN 37219**

6

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION -- Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**ATTACTHMENT 1**

**5. What happened to you that you believe was discriminatory?** Include the
date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who
you believe discriminated against you.

A) Date:   February 2013            Action: **Sexual Harassment**

Name and Title of Person(s) Responsible: **Commander Steven Lopez**

In February 2013, I went to campus early one morning around 8:00am to pick up
my check. When walking back to the parking lot, I noticed Commander Steven
Lopez and Sergeant London standing close to my vehicle talking. Commander
started talking to me about moving to the first shift. He said that he had heard
about the problems I was having on the third shift with Officer Jamie Binkley. He
told me I had made a good choice by wanting to come to the first shift. He then
invited me and Sgt. London to his house so that we could get to know each other
better and discuss how he ran things on the first shift. Sgt. Lopez's apartment is
on the Fisk University campus. Sgt. London was going to come to the meeting
after his shift ended in about 30 minutes.

I went with Commander Lopez to his house. When I arrived at the Commander's
home, I started to sit on the couch. Commander Lopez told me to sit on a specific
bar stool that was next to the kitchen window. He then started fixing me some
vodka in a very large cup. I told him that I was not really a drinker and that he was
fixing too much. He stated that he was mixing it with flavored syrup and that I
wouldn't be able to taste the vodka.  While he was fixing my drink, he told me
that him and JaCenda Davidson, the Human Resource Director, had sex. I told him
that he didn't have to discuss his love life with me. I then told him that it was not
a good idea to have an affair with someone he works with. By the look on his face,
he did not like my comment.

After he finished fixing my drink, he came and sat on the middle stool right next to me so that we were knee to knee. This made me feel very uncomfortable. Commander Lopez then started to make comments about how I was a great officer and that I should apply for the open Supervisor position. While telling me this he was patting me on my right knee with his left hand. I told him that there were officers who had been there before me that should get the position. I told him that I appreciate the compliments, but that I did not really need the extra $2.00 per hour. While still patting my knee, Commander Lopez insisted again that I should take the position. He stated that he had all the answers to the test that I would have to take. At this point, he leaned forward slightly and started moving his hand toward my inner thigh toward my groin area. I was in shock at his action, but I took my left elbow and moved his hand away. I then told him that he was out of line. In an attempt to get him up away from me, I changed the subject by asking about some war medals that he had hanging on the wall. He got up from the bar stool and walked over to the medals on the wall. He then started talking about how he was trained when he was in the service to put people to sleep. He told me to approach him and he would show me how he could put me to sleep by using a chokehold. He said to act like I was going to grab his "balls" (testicles) and he would put me in a chokehold and put me to sleep. I was shocked by what he was saying, so I asked him to repeat himself so that I was clear about what he was saying. He repeated what he said about grabbing his balls so that he could show me how to put people to sleep. He motioned for me to come over. I then told him that I didn't come over here to grab his balls or learn how to put people to sleep. At that time there was a knock at the door and it was Sgt. London. Still in shock at what had happened with the inappropriate touching and what had been said, I then watched Commander Lopez and Sgt. London hug each other as if they hadn't seen each other in years. They were calling each other buddies and homeboys. This behavior shocked me, because I had worked with each separately, and they both had told me that they didn't like one another. After about 15 minutes, I decided to leave and Sgt. London also decided to leave. As we walked toward the door, Sgt. London was about an arms-length in front of me. As I was walking toward the door, Commander Lopez patted me on my butt. I turned around and told him that he had a serious problem. As I took a step out the door, Commander

Case 3:14-cv-02012   Document 1   Filed 10/22/14   Page 14 of 57 PageID #: 14

Lopez inappropriately touched me again. This time he reached under my coat and rubbed the bottom part of my buttocks, almost reaching my genitals. I turned around again and told him in a forceful way not to put his hands on me again and that he was sick person. Sgt. London was standing in front of the apartment laughing. He had clearly heard me tell the Commander not to touch me. I told him that Commander Lopez had grabbed my ass two times. I asked Sgt. London was the Commander gay or what? Sgt. London said, with a laugh, that he did not know. He continued to laugh and got in his car. As I was leaving, I noticed that JaCenda Davidson, Fisk's Human Resource Director, was standing in the doorway of her apartment facing us talking on her phone.

The next day I attempted to call Chief Mickey West and JaCenda Davidson, Human Resource Director, regarding Commander Lopez's conduct and the problems I was having with Officer Binkley and the unprofessional conduct of Commander Timmy Wells. I called Chief West twice, but he never returned my phone calls or emails. I called Ms. Davidson four times and I also went to the Human Resource office and left two messages for her to call me. My last attempt was to talk to the Vice-President, Jason Meriwether. It was difficult to contact him since I worked from 11:00pm to 7:00am. I attempted to call him five times and left messages with his secretary, but never received a response.

Page 3 of 3

**ATTACTHMENT 2**

**5. What happened to you that you believe was discriminatory?** Include the
date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who
you believe discriminated against you.

A) Date:   November 2012 - February 2013          Action: **Racial Discrimination**


Name and Title of Person(s) Responsible: **Officer Jamie Binkley**

While serving with Fisk University Security Department, my shift was from
11:00pm to 7:00am. I occasionally worked with Officer Jamie Binkley. Ms. Binkley
created a hostile and offensive work environment. Ms. Binkley called me a "black
mother fucker, black ass son of a bitch and a "stupid black mother fucker."

During my shift, I heard Officer Binkley make racial slurs toward a blind, black
male when he cut through the campus because he was lost. Officer Binkley also
used racial slurs against a black handicapped lady in a wheel chair that cut across
the campus. Both of these individuals were coming from a gas station purchasing
food and other items. These individuals live in the neighborhood. Ms. Binkley told
me to arrest those "black mother fuckers" because she had told them not to
come on the campus. I told her that she needed to show some respect to people
who are disabled and not talk to me with that language. I told her to not call
people out of their name. She told me that she did not give a fuck about me or
them and that I needed to do what she said or she will tell Commander Timmy
Wells on me. She told me that she was my supervisor. After this incident, we had
an unscheduled meeting with Commander Timmy Wells regarding Officer
Binkley's abusive behavior.  At the meeting, Officer Binkley made offensive
comments to Commander Wells if she did not like what he had to say. She is very
controlling over Commander Wells. He apologized for Officer Binkley. He claimed
that she had an upset stomach and that her mother was sick. He stated that's just
the way she talks to people. I then told him that I thought it would be best if I

Case 3:14-cv-02012   Document 1   Filed 10/22/14   Page 16 of 57 PageID #: 16

changed my shift so that I would not have any contact with Officer Binkley. Chief West was made aware of the issues I had with Officer Binkley. He did not talk to me, but emailed Timmy Wells regarding the problems (Please see email attachment).

**ATTACTHMENT 3**

## 7. What reason(s) were given to you for the acts you consider discriminatory? By whom? His or Her job title?

I was told by Andy Hall, Assistant Director of Campus Safety, that I lacked the appropriate level of professionalism and tact while interacting with staff and students. I had received three complaints during my employment:

1) On approximately 2/16/13, after a basketball game I observed Fisk student Taylor Elom coming through the gym hallway singing out loud and using profanity from a rap song called "FUCK THEM MOTHERFUCKERS". I was standing on the steps outside the gym and as she came out the door and I asked her very politely to step to the side to discuss this matter. Fans from the visiting team were exiting the gym. One lady covered her daughter's ears so she would not hear the disgusting lyrics that Ms. Elom was singing. I then told Ms. Taylor that I was aware that she was excited that the basketball team won, but to control herself next time she was in a public place.

2) On 2/21/13, at approximately 7:30pm around the start of the boy's basketball game, a female student Ashley Atkins was observed by me driving down the sidewalk in front of the gym trying to park her car. As she was exiting her vehicle, I told her in a professional manner that she was not authorized to park there. She immediately got upset, saying that the parking lot was full and there were no more parking spaces. I then pointed and showed her that cars were leaving at that moment and that there were empty parking spots. She then responded very rudely that "maybe I needed to park her car for her then." I asked her to please find a spot in the parking lot for the third time. She went and found a parking spot at that time. As

always, per request from the Coach and Athletic Director to have all students show Fisk Identification which Ms. Atkins refused to show me and walked past me in an upset manner, because I didn't allow her to get special privileges and park in an unauthorized spot. Ms. Atkins is close friends with Commander Timmy Wells. Every time Ms. Atkins sees Commander Timmy Wells, she goes up to him, wraps her legs around his waist and calls him "Daddy." Because of her relationship with Commander Wells, Ms. Atkins expects special treatment. That was why she got upset when I told her she had to move her vehicle. She also expected to receive special treatment from me. I was doing my job as it is against Fisk University policy to park in areas other than those properly lined as parking spaces and violators are subject to being cited.

3) On 2/16/13, there was gym party held by the Kappa's (a college fraternity). During the party, I had to break up several fights by myself while the other officers were tied up with other altercations going on at the same time. Heavy pepper spray had been sprayed by Commander Timmy Wells in the gym to break up the fights between Fisk and TSU for the second week in a row. While clearing the gym I had to deal with rude and intoxicated students from Fisk and TSU. I was then clearing the New Livingston parking lot. During that time, a former student from Fisk was holding a big bottle of liquor walking thru the parking lot using obscene language. I approached him and I asked him "was he familiar with campus policy about drinking and has he lost his damn mind to be walking around on campus with liquor visible". He then turned the bottle up, took a drink, and said "fuck you and security." He told me to go fuck myself and took another drink. I approached him and took the bottle and poured the alcohol out. He then exited campus with two current Fisk students, Gregory Byers and Malcolm Miller. The students were upset because I had poured out the liquor that they claimed they had just bought. As they drove off they used harsh profanity toward me for doing my job. Commander Wells witnessed the students drinking earlier that day, but did not take any action. If the

Case 3:14-cv-02012   Document 1   Filed 10/22/14   Page 19 of 57 PageID #: 19

students belong to a fraternity, Commander Wells allows them to drink, because he was also in a fraternity at one time.

Before my termination, I had received an email from Chief Mickey West At the time of my termination, I attempted to explain to Andy Hall, Human Resource Director Jacenda Davidson and Vice-President Jason Meriwether about the false complaints made against me, but they would not give me the opportunity to explain and the Vice-President never called me. On February 26, 2013, I had received an email from Chief Mickey West who had known me longer than Andy Hall. Chief Mickey West informed me that I was a strong officer and a great addition to the team. He also told me that I had great potential to become a supervisor in our department He also stated that students are going to complain (Please see attached email.) Most of the students that complained were in violation of Fisk University policy.

I was also told by Andy Hall, Assistant Director of Campus Safety, that I violated Campus Safety Policy and Procedure Manual page 60, item DR 602 in the Employee handbook. I checked the handbook that they have given me, which is a green copy, and page 60 does not mention anything regarding removing reports (nor does page 60 in the blue copy of the Employee handbook). Our office was under construction during this time. Most of the desk in the office were empty and were up for sale. The reports in question were sitting in a tray on the desk that I had been using. There was nothing posted nor was anyone told that the desk belonged to Mr. Hall. The only time I had seen Mr. Hall was training on the gun range. He had never worked my shift (11:00pm to 7:00am). He had not introduced himself to anyone except on the gun range. I did not even know that he was the new Assistant Chief until he sent a letter dated March 1, 2013 stating that he was the Assistant Chief. (Please see the attached email). Mr. Hall lied and stated that he had done a thorough investigation. If Mr. Hall had done a thorough investigation he would have realized that there were only two people working the night shift that night, myself and Officer Marc Hancock. I could not use the computer or send emails off the computer that I had been using all the time. Officer Hancock was working the front desk on the main computer. Officer Hancock was the individual that sent the rebuttal emails. Video surveillance will

prove this. Officer Hancock knew that I was going to Vice-President Jason Meriwether's office to leave a letter for him to contact me. I had tried to contact him several times before, but I never received any calls back from his office. Officer Hancock knew that what I was going to tell the Vice President Jason Meriwether about the wrongdoings of other officers. He knew that this would expose the fact that he was not licensed by the state to be a security officer which is a violation of Fisk University policy. I don't know what Officer Hancock told Andy Hall about the emails during the investigation.

A few weeks after I was terminated, I had the meeting with the President of Fisk University, James Williams. I told him what I would have told Vice-President Jason Meriwether if he would have met with me. The President looked at the termination papers that were given to me by Andy Hall and Jacenda Davis. The President said that this was not a reason for termination. I told him that I agreed, but that Mr. Hall had said that the Vice-President told him to fire me. The President told me that he would investigate the matter and get back with me. I have not heard from the President or anyone in his office. I have tried to reach him without success. I have not heard from anyone from Fisk University regarding this matter including Human Resources or Chief Mickey West from the Public Safety Office.

**ATTACHMENT 4**

**8. Describe who was in the same or similar situation as you and how they were treated. For example, who else applied for the same job you did, who else had the same attendance record, or who else had the same performance? Provide the race, sex, age, national origin, religion, or disability of these individuals, if known, and if it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.**

**Of the persons in the same or similar situation as you, who was treated *better* than you?**

A. Full Name: Jamie Binkley

   Race, sex, age, national origin, religion or disability: white, female

   Job Title:  Public Safety Officer

Description of Treatment: Officer Binkley was usually 15 to 45 minutes late about three times per week. I witnessed Commander Timmy Wells put her time down as if she was coming in on time. According to Fisk policy, falsifying University records, including timesheets is immediate grounds for discharge (Fisk University Handbook, page 55). No action was taken to discharge or discipline Officer Binkley or Commander Timmy Wells. I believe that Commander Wells is covering for her because they have a romantic and sexual on the job relationship. I also witnessed, Officer Binkley and Commander Timmy Wells, checking the surveillance cameras to see if another officer, Morris Love who is a black male, left his shift 10 minutes early, so that they could get him suspended. They told me to come over and look at the surveillance cameras to get me to agree with them that Officer Love was leaving his shift early. I told them that he was not leaving, he just went outside to warm up his car. Officer Binkley turned to me and said "you're a smart black motherfucker." She then grabbed Commander Wells' hand like he was a child and said lets go smoke a cigarette. I told Commander Wells that he needs to take some action regarding Officer Binkley so that she would stop talking to me like that.

Case 3:14-cv-02012   Document 1   Filed 10/22/14   Page 22 of 57 PageID #: 22

B. Full Name: Timmy Wells

Race, sex, age, national origin, religion or disability: white, male

Job Title:  Commander

Description of Treatment:  While on patrol with Commander Wells, I witnessed him take illegal drugs (marijuana) off students in the male dormitories. I saw him take the marijuana and put it in his pocket. Commander Wells told the students that he would take the drugs to the FBI Disposal Unit in the morning where his mother worked. The students were not written up for having the marijuana. I later witnessed Commander Wells take the marijuana to his car. He again stated that he would take the marijuana to the FBI in the morning. There is nothing in Fisk University policy giving him the authority to take this action.

Also, on two other nights when I worked with Commander Wells, he came back in the office with blood shot eyes smelling like marijuana. It appeared that he had put on a lot of cologne to try to cover the smell. I tried to report this to Chief Mickey West and the Human Resource Office, but my calls were not returned. Commander Charles Matthews had also smelled marijuana on Commander Wells. When he reported it no action was taken. While working the third shift (11:00pm to 7:00am), I witnessed Commander Wells go to the cafeteria at around 3:00am to get coffee for the first shift for the next day. Commander Wells came back with several large bags of Starbucks coffee. I noticed that he left one bag for the first shift and put the rest of the bags in his personal vehicle.

On May 29, 2013 at approximately 3:02pm, while on campus two witnesses, Commander Charles Matthews and student Nikeshea Hughes, heard Commander Wells in the hallway after his meeting with Fisk's lawyer, **threaten to kill Officer Kenneth Wilson by stabbing him in the neck** because he had alerted the administration about Commander Wells' unprofessional behavior.

Officer Jeffrey Baker also overheard Commander Wells and Officer Binkley talk about how they had set Officer Kenneth Wilson up to get him fired. Officer Baker heard Commander Wells say that he had all kinds of high powered rifles at home where he could shoot Officer Kenneth Wilson from a distance if he ever sees him.

C. Full Name: Tommy Neese

   Race, sex, age, national origin, religion or disability: white, male

   Job Title:  Public Safety Officer

Description of Treatment: There was a gym party on campus for Fisk and
Tennessee State University students. There had been misconduct by the students.
Students were on campus consuming alcohol and smoking marijuana out in the
open and inside the gym. Serious fights (at least 10) broke out all over the gym
area. Tommy Neese was seen by me, Officer Mark Hancock and my supervisor,
Commander Timmy Wells walking down the back side of D.B. Todd Blvd away
from the fight. He did not help any of the other officers who were in need of help
to stop all the fights. No disciplinary action was taken.

Fisk University provided a golf cart for the Public Safety Office. While in Tommy
Neese's possession he left the keys in the ignition and the golf cart was stolen two
times. It was later recovered by the railroad tracks a mile away. The cart was also
damaged two more times in Mr. Neese's possession. One evening when I went to
use the cart, I noticed that it was damaged. Mr. Neese had damaged the cart and
then put it back in its parking spot without reporting the damage. When I
attempted to report the damage, I wasn't able to access my email. My email had
been disabled and I wasn't able to send any emails out. No disciplinary action was
taken against Mr. Neese regarding the negligent destruction Fisk University's
property.

Case 3:14-cv-02012   Document 1   Filed 10/22/14   Page 24 of 57 PageID #: 24

**D. Full Name: Marc Hancock**

Race, sex, age, national origin, religion or disability: black, male

Job Title:  Public Safety Officer

Description of Treatment: Officer Hancock was allowed to work as a Security Officer and carry a baton and mace while not being licensed by the State of Tennessee to do so. Commander Lopez and Commander Wells were friends with Officer Hancock and allowed this behavior without taking any action. At Fisk University, a Security Officer must be licensed by the State. Officer Hancock was hired by Fisk University on January 28, 2013 as a Security Officer. However, Officer Hancock was not licensed by the State as a Security Officer until May 24, 2013 (Please See the attachment of state license). Officer Hancock was able to obtain his job and work without a Security Guard license. Chief Mickey West, Human Resources Director Jacenda Davidson, Commander Steven Lopez, Commander Timmy Wells, and Vice President Jason Meriwether did not follow Fisk University procedures when hiring Officer Hancock. Fisk University requires that all job applicants meet the position requirements. Fisk University also conducts background checks on all applicants. Before I was hired, my background was checked to make sure I had the proper credentials. When, Andy Hall was hired as the Assistant Chief, he did not take any action to make sure that all Fisk officers were was qualified for the position that they held. Mr. Hall trained Officer Hancock and all Fisk officers on the firing range to be armed officers. Mr. Hall lied to all the Fisk University officers that he owned a company called Proactive Security Training. He had officers train on glock 22 handguns. After an investigation, the State determined that he was not a certified trainer. Mr. Hall's brother was the certified trainer. According to the state, the only license Mr. Hall had was for an Unarmed Security Officer (Please see the attachment of state license). Mr. Hall was allowed to carry a gun on campus. This was a violation of

state law. This shows that Mr. Hall lacked the appropriate level of professionalism for his position. As a result of his lying and wrongdoing, all officers had to be retrained with another certified training company APPS (Academy of Personal Protection Service). Mr. Hall is still lying about his qualifications. He currently has a certificate on the office wall at Fisk University showing that he was certified as an instructor through the Alice Training Institute. The certificate is dated June 1, 2013. According to the Department of Commerce and Insurance, this company nor the instructor, Chance Corbett, is registered with the state. This shows a pattern that Mr. Hall cannot be trusted.

⚠ This message was sent with high importance.

Attachments can contain viruses that may harm your computer. Attachments may not display correctly.

**Kenneth Wilson**

| From: | Mickey West |
| To: | Kenneth Wilson |
| Cc: | Jason Meriwether; Andy Hall |
| Subject: | FW: False Statements/Misunderstanding from Lauren Watson |
| Attachments: | 📄 FW: K Wilson Verbal Warning (19 Feb 2013)(113KB) 📄 Student Misconduct/Retaliation Against Public Safety Officers(10KB) |

**Sent:** Tue 2/26/2013 12:10 PM

Officer Wilson-



I the short amount of time that you have worked for Fisk University you have proved to be a strong officer and a great addition to the team. Students are going to complain, I realize that, but this seems to be a reoccurring issue with you. I think you are missing one piece of the puzzle when it come to your job, courtesy. Fisk University Campus Safety policy and procedure manual states that members shall be courteous, civil and respectful in his conduct towards all persons, including students, visitors, other University employees, subordinates and superiors. The use of profane, vulgar, disrespectful, inciteful or discourteous language to any person is prohibited.

On February 19th you were given a verbal by Captain Lopez (see attachment #1), Failure to interact collegially with students. In the other email you sent (see attachment #2) you mentioned this situation, but you failed to mention the profane language you used during your interaction with the student. This interaction was witnessed by Captain's Lopez and Wells. Per the employee handbook your supervisors initiated Performance Improvement Counseling. You are still in your Introductory Period at Fisk University, this period provides the employee with an opportunity to learn and become familiar with the department's guidelines and procedures, as well as the position expectations, responsibilities, and task objectives.

During the introductory period the supervisor will evaluate and provide the employee with feedback with regards to his/her performance. If job performance during the introductory period is unsatisfactory, the supervisor may provide the employee with written notice of the performance deficiency and explain how the performance/conduct needs to improve in order to continue employment. As part of the written notice, supervisors may also elect to extend the introductory period (up to a maximum of 90 days), to provide additional training, or time for additional performance assessment.

Please take this time to learn from your fellow officers and supervisors. Our mission is to preserve the safety and security of the campus community to enable the academic mission of the university to move forward. I think you have great potential to become a supervisor in our department, but you do need to improve on your courtesy. In the future you need to utilize your chain of command. You are welcome to copy in my supervisor Vice President Jason Meriwether if you feel I am not living up to my job duties, but it does you no good to copy in RD's and the Dean of Campus Technology. Assistant Director Hall will be in early Friday morning to meet with you to discuss this further. Please let me know if you have any questions. 

Thank you,

*Mickey West*
*Fisk University - Director of Campus Safety*

*1000 17th Ave. N - Nashville, TN 37208*

https://bulldogmail.fisk.edu/exchange/kwilson/Inbox/FW:%20false%20statements_xf8Pf... 3/5/2013

---

**From:** Kenneth Wilson
**Sent:** Tuesday, February 26, 2013 2:09 AM
**To:** Andy Hall; Mickey West; Jason Meriwether
**Subject:** Student Misconduct/Retaliation Against Public Safety Officers

Chief West,

        On two other occasions after a basketball game around approximate date of 2/16/13, student Taylor Elom(000041323) was observed by me coming thru the gym hallway singing out loud and using profanity from a rap song called "FUCK THEM MOTHERFUCKERS". I was standing on the steps outside the gym and as she came out the door I asked her very politely to step to the side to discuss this matter. Fans from the visiting team were exiting the gym, even one lady covering her daughters ears so she would not hear the disgusting lyrics that Ms. Elom was singing. I then told Ms. Taylor that I was aware that she was exited that the basketball team won, but to control herself next time she was in a public place. Ms. Elom came down to the office to file a complaint, but after discussing the matter again she changed her mind.

Next Student(Ashley Atkins 000041374),

        On 2/21/12 at approximately 7:30 around the start of the boys basketball game, the female student Ms. Atkins was observed by me driving down the sidewalk in front of the gym trying to park her car. I told her as she was exiting the car in a professional manner that she was not authorized to park there. She immediately got upset, saying that the parking lot was full and there were no more parking spaces. I then pointed and showed her that cars were leaving at that moment and that there were empty parking spots. She then responded very rudely that "maybe I need to park her car for her then". I asked her to please find a spot in the parking lot for the third time, which she went and found one at that time. As always per request from the Coach and Athletic Director to have all students show Fisk Identification which she refused to show me and walked past me in an upset manner, because I didn't allow her to get special privileges and park in an unauthorized spot.

On 2/16/13 the date of the Kappa's gym party and fight.

        While breaking up three fights by myself while other officers were tied up with other altercations going on at the same time. After clearing the gym out and dealing with rude and intoxicated students, I was clearing the New Livingston parking lot. During that time a former student was holding a big bottle of liquor walking thru the parking lot, I then approached him(still a little upset from fights inside party) and I asked him "was he familiar with campus policy about drinking and has he lost his damn mind to be walking around on campus with liquor visible". He then turned the bottle up, took a drink, and said "fuck yall". I then approached him and asked him to give me the bottle, which he did and I poured it out. He then exited campus and the other students with him, which are currently enrolled were upset because they had to pour out the liquor that they claimed they just bought. As they drove off they used harsh profanity toward security for doing their job.

1

Kennith Wilson     2/25/13

Chief West and Assistant Chief Hall be advised that being a new officer as well as other officers are receiving a lot disrespect and false written statements from students, because of the other officers being to relax and lenient. This includes drinking, smoking, using profanity in public areas, etc. Hopefully we could have a staff meeting to discuss and resolve these issues. I feel now that myself and other officers hands are tied that when we are on patrol doing our jobs and come in contact with student not following rules which are specified in Student Handbook, we are considered the BAD GUY, and put ourselves in situations for false reports to be filed. I have discussed with my supervisor T. Well and Chief Hall that our department invest in small video body cameras to avoid future false statements from students on our Public Safety Department. I am aware of the Departments budget cuts, so if possible please let me know if I can purchase my own personal body camera.

I Officer Wilson and others will not let these allegations discourage us from performing our job duties as discussed with Commander T. Wells and Commander S. Lopez focusing on my previous write-up dealing with the former student with liquor in parking lot.

2

**Of the persons in the same or similar situation as you, who was treated *worse* than you?**

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| | | |

Description of Treatment

**Of the persons in the same or similar situation as you, who was treated the *same* as you?**

| A.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Jeffrey Baker | black, male | Public Safety Officer |

Description of Treatment  Mr. Baker was subjected to racial name-calling, belittling and harassment by Officer Binkley. He reported her to his supervisor, but no action was taken. His employment has been terminated. See attached statement

| B.  Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Eric Thomas | black,male | Public Safety Officer |

Description of Treatment  Mr. Thomas witnessed Officer Binkley's racial name calling to students. He saw her push & shove students. He recorded her (CD attached) and reported her to supervisors and the HR Director. No action was taken.

**Answer questions 9-12 only if you are claiming discrimination based on disability.  If not, skip to question 13.  Please tell us if you have more than one disability.  Please add additional pages if needed.**

9.  **Please check all that apply:**

- ☐  Yes, I have a disability
- ☐  I do not have a disability now but I did have one
- ☐  No disability but the organization treats me as if I am disabled

10.  **What is the disability that you believe is the reason for the adverse action taken against you?  Does this disability prevent or limit you from doing anything?**  (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

11.  **Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**

Yes ☐    No ☐

If "Yes," what medication, medical equipment or other assistance do you use?

12.  **Did you ask your employer for any changes or assistance to do your job because of your disability?**

Yes ☐    No ☐

If "YES", when did you ask? _____    How did you ask (verbally or in writing)? _____

Who did you ask?  (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

I Jeff Baker reported for duty at Fisk University on March 4, 2013 at 10:53pm. I was met by my supervisor Captain Timmy Wells. Captain Wells told me that I would meet my 3rd shift Sergeant on the following Thursday. On Thursday, March 7, 2013 Sgt. Jamie Binkley came in the office and asked "is this the boy who will be on my shift." Captain Wells told her that my name was Jeff Baker. Sgt. Binkley said that all I had to do was what she tells me to do. Captain Wells told her not to start. I later learned from Chief West that Jamie Binkley was an officer, not a Sergeant. Therefore, she was not my supervisor.

On April 12, 2013, Officer Jamie Binkley arrived in the office for her shift. She asked me was Officer Marc Hancock on duty. I told her that Officer Hancock was on duty and had reported on time. She stated that she needed to know if he was at work, because if not she was going to write him up. I told her that she couldn't write him up because she was not our supervisor and she had been late every day since I started working there. She then said "who cares cotton boy, because I am a white girl, don't do what I do, do as you are told because if not I'll put Tim (Captain Timmy Wells) on you. I then told her don't ever call me cotton boy again or threaten to report me or I will tell Captain Wells what she said. She then stated that's what you think boy and left the office. I later went on the yard to calm down. I saw Officer Binkley talking very loudly on her cellphone. She did not see me. I heard say "you better tell that nigger Baker to keep his fucking mouth off me and don't worry about what I do. You better tell him or else I want be fucking with you anymore." As I was walking away, Sgt. Binkley saw me and said "where are you going cotton boy," but I just kept walking. Chief West was informed about Officer Binkley's conduct, but he did nothing about her actions. I even spoken to Captain Timmy Wells, he stated that he knows how she is. Captain Wells said don't pay her any mind. He said that he would tell her to back off.

On July 11, 2013, I reported for work on 10:53pm. Officer Binkley arrived after me at 11:09pm. I asked Officer Binkley was Captain Wells going to be late. She told me not to worry about Tim just worry about your ass not being here anymore. I asked her what she was talking about. She stated you will see in the morning cotton boy. I left the office and started patrolling. Later that evening I had to go back to the office to discuss with Officer Binkley if a student had permission to

park an ice truck on campus. Officer Binkley was yelling at the student that he didn't have permission to park the ice truck on campus. I told Officer Binkley that the student had the proper paperwork. She told me to shut the fuck up, because she was not talking to me. I told her not to talk to me like that. The student stated that Officer Binkley was crazy and that he was going to report Officer Binkley in the morning. Officer Binkley told the student that she will have Tim to beat his ass because she was a white girl and can do what she wants. After I told the student that I would be his witness, Officer Binkley stated "your black ass is out of here you just don't know it yet, but you will see in the morning." She then laughed and walked off. At 7:00am the next morning, I was called to the office where Chief West, Asst. Chief Andy Hall and H.R. Director Jacenda Davidson told me I was fired. I think I was fired because of my complaints about Officer Jamie Binkley to my supervisors and to Chief West.

Jeffrey Baker

(615) 582-0516

# MEMORANDUM

TO:        Commander Matthews

FROM:     PSO Eric B. Thomas

DATE:         4 August 2011

RE:        Officer Misconduct


Commander, I am creating this memorandum in an effort to inform you of the concerns that I have, which include our fellow PSO Binkley. These concerns are being exposed for two major reasons. The first reason is the fact that I feel obligated to report such issues considering the fact that I am an officer. Secondly, I believe immediate attention to these issues, could possibly prevent Fisk University from future lawsuits. Topics pertaining to the misconduct of PSO Binkley are listed below. (Topics include the incident that took place at New Livingston Hall on 8/3/11).

Areas of concern...



1. Officer playing/joking with students, in a manner that dilutes "Officer-Student relationships"
2. Racially offensive comments stated by PSO Binkley, towards students
3. Physical force, which include pushing a student
4. Failing to follow proper chain-of-command after being involved in an altercation with a student

On the night of 3 August 2011 at approximately 2000 hrs, I was asked to 10-19 down to New Livingston Hall by Officer Jamie Binkley. As I approached the front of New Livingston, I noticed Officer Binkley and a student by the name of Justin arguing in front of the building. Once I finally arrive at the front of New Livingston, the student (Justin) immediately walked up to me and thanked me for coming because he was having a problem with Officer Binkley. The student stated that Binkley would not give him his ID back, and that she started off playing around with him and his friend (name unknown), and then she wanted to switch and get serious with them.

I asked Justin, "What happened"? Justin stated that he and his friend were getting ready to walk into the gym, when Officer Binkley approached them and stated that they cannot enter that building. Justin then said he and his friend (both are well known Fisk students

that I recognize) began to walk towards New Livingston Hall to go inside, since they were denied access into the gym. (At this point, Officer Binkley instructed the dispatcher via radio, to watch the front doors of New Livingston to see if the two guys would try to walk in).

Once the guys walked up to New Livingston doors, Binkley demanded both students to produce their ID'S. Justin was the only one to hand over his ID. Justin proceeded to explain his story by saying, during their walk from the gym to New Livingston, Jamie was playing with them acting as if she was trying to run them over with the golf cart. Student said Binkley told him and his friend that the better not play with her because **"she is a white woman"** (remember both students are black). Justin also stated that Binkley went from playing, to yelling and demanding their ID'S.
At this point I arrived on the scene, and heard Binkley yelling back and forth with Justin. **She was telling him that she is on the phone with Timmy, and he can hear everything.** Binkley also immediately admitted to me that **she forcefully pushed the student** when he reached to get his ID back. I deescalated the situation, gave the student his ID, and told him he could leave. Meanwhile, Binkley was still aggressively talking to the student, despite his several attempts to apologize.

Once the student left, I spoke with Binkley. She said that the situation is not over because she really wants Justin to be punished, and she is going to have Timmy write up a report on the student, and give him a good chewing out. I informed Jamie that Timmy cannot write a report for something that happened on 2nd shift, and she insisted that Timmy can help her.

My personal concerns of this matter is the fact that Jamie made a racist comment, she pushed the student, and she spoke to the students inappropriately; all while being on the cell phone with Timmy. Based on working with Jamie, I have seen her start a lot of things with students because she wants to prove that she is an authority figure. She treats them like they are criminals, when they are just students trying to enjoy college. She is always questioning them inappropriately, and overly playing with certain students, but still want them to respect her and know when she is serious and not playing.
I also did not like the fact Jamie insisted on involving Timmy on a 2nd shift issue. Commander all of these examples are concerns that I have, if there are any questions, please let me know. Thanks.

Eric Thomas

Former Fisk University employee

(313) 971-1247

# Department of Commerce and Insurance
## Julie Mix McPeak, Commissioner

### VERIFY.TN.GOV - License Search and Verification

- You can use this website to verify the license status of people in dozens of professions, including home improvement contractors, real estate agents, security guards and cosmetologists.  For more information about how to use Verify.TN.Gov, **please read our FAQ's Page by Clicking Here.**
- VERIFY.TN.GOV only provides verification for licenses that are required by Commerce and Insurance. If you need to find other license verification services for other state agencies (e.g. health, medical, etc.), please do a search for those services by clicking here.
- Insurance Division Information is located here:  Insurance Division Online Data and Tools
- After you submit the search form, **your results will appear below the form in this window** (the form will remain for your reuse)...**if you cannot see the results below, please scroll further down the search form.**

### License Details

| License Status | ACTIVE - FULLY LICENSED |
|---|---|
| License # | 620112 |
| License ID | 620112 |
| Expiration Date | May 31 2015 |
| Original Date | May 24 2013 |
| Profession Code | 3705 |
| Profession Name | Armed Security Guard/Officer |
| First Name | MARC |
| Middle Name | \ |
| Last Name | HANCOCK |
| City | LEBANON |
| State | TN |
| Zip Code | 37087 |
| Rank | Armed Guard |
| License Activity Description | SCANNED |

- Department of Commerce and Insurance
- 500 James Robertson Pkwy
- Nashville, TN 37243-0565
- (615) 741-2241
- Ask.TDCI@TN.Gov

tp://verify.tn.gov/Details.aspx

9/29/2013

# Department of Commerce and Insurance
## Julie Mix McPeak, Commissioner

### VERIFY.TN.GOV - License Search and Verification

- You can use this website to verify the license status of people in dozens of professions, including home improvement contractors, real estate agents, security guards and cosmetologists.  For more information about how to use Verify.TN.Gov, **please read our FAQ's Page by Clicking Here.**
- VERIFY.TN.GOV only provides verification for licenses that are required by Commerce and Insurance. If you need to find other license verification services for other state agencies (e.g. health, medical, etc.), please do a search for those services by clicking here.
- Insurance Division Information is located here:  Insurance Division Online Data and Tools
- After you submit the search form, your results will appear below the form in this window (the form will remain for your reuse)...if you cannot see the results below, please scroll further down the search form.

## License Details

| License Status | ACTIVE - FULLY LICENSED |
|---|---|
| License # | 406966 |
| License ID | 406966 |
| Expiration Date | Jan 31 2014 |
| Original Date | Jan 22 2010 |
| Profession Code | 3701 |
| Profession Name | Security Guard/Officer |
| First Name | ANDREW |
| Middle Name | BLAKE |
| Last Name | HALL |
| City | LEBANON |
| State | TN |
| Zip Code | 37087 |
| Rank | Unarmed Guard |
| License Activity Description | SCANNED |

- Department of Commerce and Insurance
- 500 James Robertson Pkwy
- Nashville, TN 37243-0565
- (615) 741-2241
- Ask.TDCI@TN.Gov

# FW: PSO Wilson

**From:** Mickey West
**Sent:** Fri 1/4/2013 12:50 PM

Captain Wells-

I think you still have a problem between Wilson and Binkley. What I would suggest is for you to pull the reins in on your shift. Give them less freedom to do the job how they want to do it, and get them in line with the standards of our department. I don't want to single either one of them out, but I have seen Wilson in action and the way he treats our students, and it is not how we run our shop. We have worked extremely hard on our relationship with the campus community and I don't want any one person to come in and mess it up. Lively was on that road, and I'm glad he is gone. Binkley has <u>very</u> strong views on the way she thinks things ('everything ☺) should be done, and sometimes she gets a little too outspoken with that.

am confident in your leadership skills and the way <u>you</u> do your do your job on third shift. You make it so I on't have to worry about much, but you do need to focus more on your people and training them to work together and accomplish the departments goals. **No personal agendas.**

put a copy of the departments mission in everyone's mailbox yesterday. Use that as tool to get everyone ing in the same direction. Included all shift commanders in this email because I feel each shift has room for improvement when it comes to team work and accomplishing the department's goals.

Ali please reply to this email with any questions, concerns, and whether you agree or disagree with my evaluation.

Thank you,

*Mickey West*
**Fisk University - Director of Campus Safety**

*1000 17th Ave. N - Nashville, TN 37208*

*Office: 615-329-8680*

*Cell: 615-438-4942*

*mwest@fisk.edu*

*"The student is the most important person on this campus.*

*Without them there would be no institution.*

*We are dependent on them.*

*They are not to be hurried away so we can do our own thing.*

*They are not an interruption to our work but the purpose of it."*

**From:** Timmy Wells
**Sent:** Friday, January 04, 2013 5:49 AM
**To:** Mickey West
**Subject:** PSO Wilson

*Chief,*

*I talked to Wilson tonight and he stated that the issue with Binkley was over with after I came up here and us 3 had a sit down, I just explained to both of them to suck it up and be adults and work together.*

*The issue that he talked to Steve about was that he might have to quit if he couldn't try and move to 2nd shift due to family problems. He said that he is going to try and call you today*

## Kenneth Wilson

| | |
|---|---|
| **From:** | Andy Hall |
| **To:** | safety |
| **Cc:** | Mickey West; Jason Meriwether |
| **Subject:** | Introduction |
| **Attachments:** | |

**Sent:** Fri 3/1/2013 3:28 PM

All-

I am sorry for not doing so sooner but I want to make sure that each of you know who I am and how to reach me. I have accepted (and already started) a position as Assistant Director of Campus Safety with Fisk University, and look forward to getting to know each one of you better as we work to make our department the premier University Campus Safety Department in the southeast United States. As the owner Proactive Training I have enjoyed working to help increase your tactical abilities, and have made it a goal to continue with that process. Over the coming months I will look to each of you for your assistance completing the many projects that Director West and I have for the department.

In my signature below you will find my newly assigned office number and my personal cell phone number. Don't hesitate to call with any questions or concerns you may have. I plan to work next week during spring break and will be available should anything come up.

Thanks for your commitment to making Fisk Campus Safety great!

Andy Hall

Asst. Director of Campus Safety

Fisk University

1000 17th Ave N.

Nashville, TN 37208

515-715-6933 Mobile

615-329-8670 Office

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

| A. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Timmy Wells | Commander | 1000 17th Avenue North, Nashville, TN 37208 (615) 329-8680 |

**What do you believe this person will tell us?**
Commander Wells was witness to the discriminatory treatment toward me by Officer Binkley and the hostile work environment it created. Commander Wells and Officer Binkley are in a romantic relationship, I do not believe he will tell the truth about her actions.

| B. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| Calvin London | Sergeant | 1000 17th Avenue North, Nashville, TN 37208 (615) 329-8680 |

**What do you believe this person will tell us?**
Sgt. London witnessed the unwanted touching by Commander Steven Lopez. However, I don't think he will be truthful about the incident because he lives on campus in Fisk owned housing and is afraid of retaliation. Please See Attachment 5 for other witnesses.

**14. Have you filed a charge previously in this matter with EEOC or another agency?**   Yes ☐   No ☒

**15. If you have filed a complaint with another agency, provide name of agency and date of filing:**

**16. Have you sought help about this situation from a union, an attorney, or any other source?**   Yes ☒   No ☐
Provide name of organization, name of person you spoke with and date of contact. Results, if any?
I spoke with attorney Ann Buntin Steiner. I was advised to file a complaint with the EEOC.

**Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire.** If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. **If you do not file a charge of discrimination within the time limits, you will lose your rights.** If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

Box 1    ☐ I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. **I also understand that I could lose my rights if I do not file a charge in time.**

Box 2    I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that **the EEOC must give the employer, union, or employment agency that I accuse of discrimination** ☒ **information about the charge, including my name.** I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

_____        _____
**Signature**                                      **Today's Date**

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1. **FORM NUMBER/TITLE/DATE.** EEOC Intake Questionnaire (9/20/08).
2. **AUTHORITY.** 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3. **PRINCIPAL PURPOSE.** The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4. **ROUTINE USES.** EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or if EEOC becomes aware of a civil or criminal law violation. EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters
5. **WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION.** Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

**ATTACTHMENT 5**

**13. Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)**

Full Name: **Rebecca Lynn King**

Job Title: GCA Contractor Custodian/ID# 1005207

Address & Phone Number:

1000 17th Avenue North, Nashville, TN 37208

(615) 329-8811


What do you believe this person will tell us? Ms. King came up to me a couple of days after inappropriate behavior at Commander Steven Lopez's house. She told me in our office as she was cleaning up that Sgt. Calvin London had told her about the sexual advances Commander Steven Lopez had made toward me. I asked her tell Commander Steven Lopez that Sgt. Calvin London was telling people about the incident so that he knew that it didn't come from me. I was trying to go to Commander Steven Lopez's shift and didn't want him to retaliate against me.

**Full Name: Marc Hancock**

**Job Title: Public Safety Officer**

**Address & Phone Number:**

**1000 17th Avenue North, Nashville, TN 37208**

**(615) 329-8680**

**What do you believe this person will tell us?** I discussed the sexual harassment by Commander Lopez with Officer Hancock. I did not know at the time that Officer Hancock is good friends with Commander Lopez and Commander Wells as they recruited him. Since they are friends I not sure he will be truthful.



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Nashville Area Office**

220 Athens Way, Suite 350
Nashville, TN 37228-9914
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
Nashville Status Line: (866) 408-8075
Nashville Direct Dial: (615) 736-5863
TTY (615) 736-5870
FAX (615) 736-2107

June 3, 2014

Kenneth Wilson
649 Carmel Ave.
Madison, TN 37115

RE: EEOC Charge No.: 494-2014-00126
    Kenneth Wilson v. Fisk University

Dear Mr. Wilson:

This letter is to advise you of the position of the Respondent in the above referenced charge. In your charge, you alleged that because of your race/Black and sex/male, you were subjected to racial comments by a White, female co-worker and were sexually harassed by a male supervisor. You alleged that you repeatedly attempted to complain to management and received no response. You alleged that you were terminated in retaliation for making complaints.

Records show that you were employed by the Respondent as an OCS Officer. As described in Fisk's "Prevention and Reporting Procedure", found at page 36 of the Employee Handbook, an employee who believes he/she has been harassed must report the alleged harassment to the Office of Human Resources. The Director of Human Resources conducts the investigation for employees. Fisk employees are trained on this policy upon hire, and Fisk conducts harassment training for its employees every 12-24 months.

Records show that you only made allegations of harassment and misconduct *after* your termination, on March 2, 2013. The Respondent denied you complained about racial comments by a co-worker. The Respondent confirmed that you complained that Commander Lopez touched you in your genital area while you were inside Mr. Lopez's home for drinks along with Officer London. Fisk commenced an investigation in March, 2013. Parties who were named as witnesses by you were interviewed, and relevant documentation was reviewed by investigators during that period of time. Upon conclusion of the investigation, Fisk found no evidence to support your claims.

Records show that having previously received final written warnings for harassment of students and numerous instances of misconduct and deviation from established policies, you were terminated after breaking and entering the offices of Fisk's Vice President of Student Engagement and Enrollment Management Jason Meriwether (Black male), and OCS Deputy Chief Andy Hall (White male). You did so to surreptitiously obtain copies of harassment complaints against you, and to respond to those complaints outside OCS chain of command. Those break-ins violated security and complaint protocols of OCS offices, and constituted conduct warranting immediate discharge.

The person recommending your discharge was Mr. Meriwether (Black male), upon discovering that you broke and entered into his office on February 27, 2013. JaCenda Davidson, Director of Human Resources, (Black female) confirmed Mr. Meriwether's instructions.

Records show there were no other employees who committed the same or similar offenses during the relevant time frame. Others discharged during the relevant time frame were:

1. OCS Officer Myrone Smith (Black male) for violation of complaint and security protocols, and
2. OCS Officer Gabriel Collins (Black male) for unprofessional and inappropriate conduct and a disregard of generally recognized professional standards.

***

If you have any additional information **not already submitted** to rebut the employer's position, please provide it in writing within 10 days from the date of this letter. Your charge will then be forwarded for supervisory review and Director's decision which will be based on the information provided by both parties. In the event it is determined that the evidence does not support a finding of discrimination, your Dismissal and Notice of Right to Sue will be sent to you. Please be reminded that if you choose to file a lawsuit in federal court, you must do so within 90 days of receipt of the Dismissal Notice, or your right to sue is lost and cannot be restored. If you have any questions, feel free to contact the undersigned.

Sincerely,

*Laura Stubblefield*

Laura Stubblefield
Investigator
(615) 736-5808

**Response A (Racial Harassment by Jamie Binkley)**

The Respondent denied that I complained about racial comments by a co-worker. The Respondent references Fisk's "Prevention and Reporting Procedure," found on page 36 of the Employee Handbook. I **never received a copy** of this Employee Handbook. During the first week of employment, while being trained by my supervisor Commander Timmy Wells, I was given the "Fisk University Department of Public Safety Policy and Procedures Manual" in a green binder (Please See Attachment A). There is nothing in the Department of Public Safety Policy and Procedures Manual regarding procedures for complaining about discrimination or harassment. When I was first employed, Commander Timmy Wells told me that they had other handbooks, but that he did not have any available at the time. Commander Timmy Wells told me not to worry some would be made up and he would give me a copy. I was never given a copy of the Employee Handbook by Commander Timmy Wells even after asking several times. A few months after I was discharged, a Fisk employee, whose name that I do not know, gave me a copy of a blue Fisk Employee Handbook dated 2007.

When the racial slurs and harassment by Officer Jamie Binkley occurred I reported the incidents to Chief Mickey West and to my immediate supervisor, Commander Timmy Wells. As supervisors, Chief Mickey West and Commander Timmy Wells should have informed the Human Resource Director about my complaints. I was informed later by **other Officers** that Commander Timmy Wells and Officer Jamie Binkley have had an ongoing sexual relationship for quite some time. According to the copy of the blue Employee Handbook that I was given after my termination dated 2007, page 29, regarding Relationships in the Workplace. Employees that engage in personal relationships (including romantic and sexual relationships) should be aware of their professional responsibilities and accept responsibility for assuring that the relationship does not raise concerns about ethics, conflicts of interest, favoritism, and/or bias. Romantic or sexual relationships in which one individual has influence or control over the other's conditions of employment such as pay, performance evaluation, hiring or discharge are inappropriate and must be disclosed to the employee's supervisor.

As a result of my complaints, Chief Mickey West emailed Commander Timmy Wells about my issues with Officer Jaime Binkley (Please See Attachment email dated 1/4/13). As a Supervisor, Chief Mickey West should have reported my complaints to the Human Resource Director and an investigation could have taken place, but it never happened (again Human Resources failed to do their job according to their policy on employee complaints).

On my own accord, I went to the Human Resource Office several times at the end of my shift. I would wait at least an hour, but the Human Resource Director, Jacenda Davidson did not come into the office. I was told by different office personnel to leave my name and number and that the Human Resource Director would contact me. I witnessed these employee put my name and number on Jacenda Davidson's desk. I never received a phone call or an email from Human

Resource Director Jacenda Davidson (again Human Resources failed to do their job by not responding).

There have been other Officers that have either witnessed or have also been a victim of the racial harassment by Officer Jamie Binkley. Officer Eric Thomas, a former Fisk Officer, also witnessed and recorded Officer Binkley making racially offensive comments toward black students. Officer Jaime Binkley told two black students that "they better not play with her because she is a white woman." She also pushed the students and tried to run over them with a cart (Please See attachment C and enclosed CD). Officer Jamie Binkley tried to cover up the incident by letting Commander Timmy Wells handle the incident according to Officer Eric Thomas' report.

Former Officer Jeffrey Baker, who worked the same shift as I did, 11:00 pm to 7:00 am, was also a victim of racial slurs toward him by Officer Jamie Binkley which created a hostile work environment. Officer Jeffrey Baker reported Officer Jamie Binkley's action to Human Resources, but didn't get any response. He then reported Officer's Jamie Binkley's action to Chief Mickey West and to Fisk President, H. James Williams, but again no action was taken.

This should be significant proof that this conduct was going on before my employment, during my employment and after my employment. Again, this shows that Human Resource Office and Chief Mickey West are not doing their jobs. They were trying to keep this situation in-house instead of solving the problem.

**Response B/Sexual Harassment Investigation**

The Respondent confirmed that I complained that Commander Steven Lopez touched my genital area. After an investigation, Fisk found no evidence to support my claim. Based on the information that I provided in my EEOC Intake Questionnaire, page 2 Attachment 1, Sgt. Calvin London was present during the inappropriate touching by Commander Steven Lopez. If Sgt. Calvin London stated that he did not witness or know about the incident then he is covering up for his friend and supervisor Commander Steven Lopez. He may be is afraid of retaliation from Fisk University as he lives in campus housing around the corner from Commander Steven Lopez who also lives on campus housing. Human Resource Director Jacenda Davidson also lives on campus housing next to Commander Steven Lopez. Commander Steven Lopez and Sgt. Calvin London are good friends. This is a conflict of interest as Commander Steven Lopez is Sgt. Calvin London's shift supervisor. The day after the inappropriate touching by Commander Steven Lopez, Sgt. Calvin London was talking to other people in the office about the inappropriate touching by Commander Steven Lopez. A Fisk custodian, Rebecca King, who cleans the office, overheard Sgt. Calvin London talk about the inappropriate touching. Please see EEOC Intake Questionnaire page 4, Attachment 1). If Ms. King denies overhearing this conversation and telling me about it she may be afraid of retaliation and losing her job. I am willing to take a lie detector test that these two individual knew about the inappropriate touching that happened at Commander Steven Lopez's apartment. The next day I attempted to contact the Human Resource Director Jacenda Davidson. I called Ms. Davidson and left messages for her to call me, but did not get a response. I also called and left message for Chief Mickey West concerning this incident, but did not receive a return phone call. My last attempt was to talk to Vice-President, Jason Meriwether. It was difficult to contact him since I worked from 11:00pm to 7:00am. I called and left several messages with his secretary, but did not receive a response.

**Response C/False Breaking and Entering Allegation (Jason Meriwether)**

The allegations that I broke into Jason Meriwether's office to obtain complaints are false. I already had knowledge about the complaints from my supervisor Commander Timmy Wells. I had no knowledge that the complaints were kept in Jason Meriwether's office.

The complaints discussed with me in the office were: (1) on 2/16/13, student Taylor Elom using profanity (2) on 2/16/13, a former Fisk student drinking and using profanity (3) student Ashley Atkins parking in an unauthorized spot. (Please See EEOC questionnaire, page 2, Attachment 3). These students were violating Fisk policy. In order to do my job properly, I am required write up students a citation if they are violating Fisk Policy. I had a conversation with Chief Mickey West about students coming into the office when there were at fault (and knew they were at fault). On February 26, 2013, I had received an email from Chief Mickey West informing me that students are going to complain. If there were any more complaints made they were not discussed with me.

All write ups for student misconduct, such as illegal parking, fighting, profanity, drinking and illegal drug use, were to be put into Commander Timmy Wells mailbox for review. Most of these students are good friends with Commander Timmy Wells. Some of the students were suspended or reprimanded. While others nothing was done at all to others. Commander Timmy Wells showed favoritism toward the students that he knew.

I discussed these complaints with my supervisor Commander Timmy Wells when they were brought to my attention. Commander Wells informed me that he knew that the students were at fault, but because of the schools financial situation they did not want to certain suspend the students. He also said that the students were paying money to attend the school. Other Officers told me that they overheard Commander Timmy Wells tell students to keep complaining about me so that maybe I would start to overlook the things they were doing wrong. Another former officer, Jeffrey Baker, who also worked the 11:00pm to 7:00am shift, will testify that his write-ups were ignored. **That is why students were so disrespectful toward new officers that worked the 11:00pm to 7:00am shift that was supervised by Commander Timmy Wells; they knew that Commander Timmy Wells would show favoritism and eliminate any write-ups.**

**Response D/ False Breaking and Entering Allegation (Chief Andy Hall)**

The allegation that I broke into Chief Andy Hall's office is false. At the time of my employment, Chief Andy Hall did not have a secure office. The main security office was under construction. All the desks were being replaced or sold off to anybody that wanted to purchase them. If Chief Andy Hall had an office during my time of employment, I was not aware of it. Other Officers will also testify that Chief Andy Hall did not have a secure office at that time.

**Response F/ Going Outside the Chain of Command**

Regarding going outside my chain of command, I was attempting to inform Vice-President Jason Meriwether about the (1) racial slurs by Officer Jamie Binkley, (2) the inappropriate touching by Commander Steven Lopez, (3) Commander Timmy Wells stealing from the lunch room (coffee products) and smelling like marijuana and (4) Officer Jamie Binkley sleeping on the job. That was why I was attempting to contact Vice President Jason Meriwether, it had nothing to do with the complaints. The complaints that I received from the students were unfounded as the students were clearly in violation of Fisk policy.

I did not go outside of my chain of command by sending rebuttal email. I could not log into the computer on my desk that I had been working on since I started. Therefore, I was unable to send any email. **If you check the surveillance camera in the office and the time the emails were sent (if this evidence has not been destroyed) you will see that I was not in the office**. Officer Marc Hancock was the only one on the main computer the night the emails were sent. Officer Marc Hancock volunteered to send the emails as I was unable to get in contact with Chief Mickey West or Human Resources. There is no proof that I sent out any rebuttal emails. Officer Hancock may be reluctant to admit the truth because he wanted a position that was coming open on the day shift. At that time, Officer Marc Hancock was a new employee. He was highly recommended by Commander Steven Lopez and Commander Timmy Wells. Since I had more seniority so the position would have went to me. He knew that I was fixing to blow the whistle to Jason Meriwether about the wrong doings by the officers on the night shift and Commander Lopez inappropriate touching. He also knew that this would expose that he should not have been working there as he did not have a security license at that time. This falls back on management and Human Resources not doing their job.

In closing, this is not about the complaints from students it is about a cover-up to keep me from blowing the whistle on the Department of Public Safety regarding the wrongdoings of officers in the Department and Human Resources not taking any action. If the Vice-President would have gotten back in touch with me this situation could have been resolved. This is why I went to the new President after my termination to explain my actions. The Vice President has now been terminated from his position.

# Witness

<u>Commander Charles Matthews</u>

1) I, Commander Matthews, had worked as Security/Patrol office at Fisk for several years. I have worked with officers on all shifts, including the third shift. I have witnessed the strong and close/romantic relationship between Commander Timmy Wells and Officer Jamie Binkley. Officer Binkley was shown special treatment such as not having to report to work on time (she came in late numerous times). Commander Wells would fix her timesheet as if she came in on time. Officer Binkley was also seen sleeping on the job. She also did not wear her proper uniform (pants and hat). Other officers complained to Chief Mickey West about the special treatment that was given to Officer Binkley. Officers also tried to complain to Human Resources about the special treatment, but nothing was ever done. Other Officers including, Officer Angela Baxter, Officer Calvin London, Officer Love and Officer Marc Hancock had worked around Commander Timmy Wells and Officer Jamie Binkley on the night shift. These officers knew that they had a close relationship.

2) I, Commander Matthews, will testify that, after Officer's K. Wilson's termination from Fisk University, while doing security at a party in the gym on Fisk campus another fight broke out with students. The fight spilled out from the gym into the parking lot. I could see students drinking and some were intoxicated and the situation got out of control again just like past parties. I witnessed Commander Timmy Wells in the parking lot trying to get the students under control. The students as usual were being very disrespectful. Commander Wells lost control and in a very aggressive manner was cursing students out when they did not listen to his commands. Commander Steven Lopez was standing nearby. To my knowledge, Commander Timmy Wells was not written up for his action. Commander Timmy Wells also had a can of <u>bear spray</u>. He hollered that he would use it on the students if they did not listen to him.

3) I, Commander Matthews, heard from Officer Jeffrey Baker who had worked with Officer Marc Hancock on the third shift that Officer Hancock would be requested by a female student, _____, who was a basketball player to come down to the gym between 1:00am and 3:00am to sit with her while she washed clothes. She was responsible for washing the uniforms for the girls' basketball team. She only wanted Officer Hancock, no other officer. Officer Hancock had expressed that he liked the female student very much. Officer Hancock was warned that he did not need to be with that student that time of night by Officer Jeffrey Baker and other officers. Officer Hancock would not listen and continued to go to the

gym late at night. According to Officer Baker, Commander Timmy Wells gave Officer Marc Hancock permission to go to the gym to be with the student. Officer Baker stated to me that he overheard Commander Timmy Wells, while laughing, tell Officer Hancock don't go down there and make no babies.

4) I, Commander Matthews, will testify that there was too many parties scheduled for students that got out of control. Especially if there was TSU students invited to the gym. Most of the officers that were scheduled to be off during the parties were forced to work those events. Students were allowed to drink in the parking lot and the smell of marijuana filled the gym. These events put officers' lives in jeopardy. Students would curse officers out because they knew that they could get away with it.

I, Commander Charles Matthew, will testify that during my employment I smelled marijuana on Commander Timmy Wells. I reported this to Chief Mickey West and to Human Resources, but nothing was done.

I, Commander Charles Matthew, certify that the above information is true.

*Charles M. Matthews*

**Print Name**

Address: *306 Mystic Hill Dr Goodlettsville Tn. 37072*

*Charles M. Matthews*

**Signature**

Email: *Cm2sea@yahoo.com*

*10 / 16 / 2014*

**Date**

Phone#: *615 484-8796*

# Witness

**Officer Jeffrey Baker**

I, Officer Jeffrey Baker, was employed Fisk University as a Security/Patrol officer. My schedule was from 11:00pm to 7:00am. My supervisor was Commander Timmy Wells. I worked with Officer Jamie Binkley. During my employment, I was subjected to racial slurs by Officer Jamie Binkley in the presence of my supervisor, Commander Timmy Wells. When the racial slurs started at the beginning of my employment, I talked to Commander Timmy Wells about Officer Binkley's comments. He acted like it was no big deal. He stated "that's the way she talks all the time because she use to work at CCA (Correction Corporation of America) talking to inmates. I let Commander Wells know that I did not like Officer's Binkley's behavior and comments. I tried to report it to Chief Mickey West and Human Resources, but I did not get a return phone call from either of them. While working the night shift with Commander Timmy Wells and Officer Binkley, I noticed the special treatment that she received. She did not come to work on time and slept on the job. On a few of occasions, both Officers would leave the office at around 2:00am or 3:00am. They would say that they were going to smoke a cigarette. I was told not to call them on the security channel if I needed something. I was told to call Commander Timmy Wells only on his cell phone. I noticed that they would get into Commander Timmy Wells truck and drive off. I would not hear from them for a couple hours. A couple of times when they came back, I noticed that they were acting very silly. They were giggling and chasing each other down the hallway trying to tickle one another. It seemed like one or both of them may have been smoking marijuana. Officer Binkley may have been trying to cover up the smell as her perfume was stronger than before and Commander Timmy Wells' eyes would be very red. On one occasion after coming back from patrol, I sat down to take a break and I pretended that I was taking a nap. I overheard Commander Wells tell Officer Binkley that they were glad that Officer K. Wilson was terminated and how they had set him up by telling students to come in and file false reports. Commander Wells did not want Officer K. Wilson to write up students that were his friends even though he knew that they had violated Fisk policy.

On other occasions, while working parties that were scheduled on the weekend, I noticed Commander Timmy Wells pass by students that were drinking and smoking marijuana in the parking lot. Commander Timmy Wells did not say anything to the students. While on patrol in the boys' dorm with Commander Timmy Wells, we would notice students in their rooms late at night smoking marijuana, drinking and occasionally have female students in their room. Commander Wells would often let the student continue what they were doing even though he

knew it was against Fisk policy. He would tell me that these are good kids, that he would rather them do it on campus than in the streets. He told me not to worry about it.

I, Officer Jeffrey Baker, when on patrol and working with only Jamie Binkley on patrol in the boys dorm while approaching a student's room with loud music and smell of marijuana with female students inside after hours. I as a new officer was subject to abusive language from the students. They said that I couldn't do anything to them such as writing them up because they knew Commander Timmy Wells and he would take care of it.

I, Officer Jeffrey Baker, was approached by Officer Marc Hancock in October 2013 while working at a church around the corner from Fisk University (Officer Hancock was on a Fisk golf cart on patrol). Officer Hancock told me (Officer Baker) that he felt bad that he did not tell the truth about that night he worked with Officer Wilson. He stated that he was the one that sent the e-mails out, not Officer Wilson!! He stated that he tried to send it only to Vice-President Jason Meriwether to let him know that Officer Wilson was trying to get a hold of him to discuss all the thing that was happening on the shift (Supervisor Wells stealing coffee out of the cafeteria, Officer J. Binkley using racial slurs toward him (Wilson), that some time they smelt like marijuana and what had happened at Commander Steven Lopez's house (inappropriate touching). Officer Wilson could not log in that night, so he asked Officer Hancock to send a statement that he needed to see him soon as possible (not complaints from students). Officer Hancock then gave me an envelope to give to Officer Wilson if I saw him working anywhere. It was not sealed, so I asked could I look at what was inside the envelope and Officer Hancock said yes. In the envelope was a document showing that Commander Steven Lopez had fired Officer Wilson (Please See Attached Document). Officer Hancock said he saw Officer Calvin London showing it to some students outside the office one day and Officer London gave it to Officer Hancock to read. Officer Hancock said Officer London told him (Hancock) that he could read it, but to ball it up and throw it away. Officer Hancock said Officer London also told him that he knew two days before that they were going to find a way to get rid of Officer Wilson, because of what had happened at Commander Steven Lopez's house. Officer Hancock said that Officer London told him that he told the Fisk investigator's the same thing and he was laughing about it. Officer Hancock told me (Officer Baker) before he went back to the campus, that he felt that Officer Wilson got screwed out of his job and that he heard from Commander Timmy Wells that he had fired Officer Wilson! On another day talking to some students, Commander Timmy Wells said that the Vice President fired Officer Wilson! I Officer Baker, asked Officer Hancock, how Commander Lopez could fire Officer Wilson when he was not his supervisor!! IT SEEMED TO ME THAT FISK IS TRYING TO COVER UP SOMETHING!! I, Officer Baker, gave this document to Officer Wilson three weeks later (Please See Attached Document stating that Commander Steven Lopez (Discharged Wilson). When I saw Officer Wilson I asked him who fired him. He said that too many lies have been told about him and he was going to make sure the truth was

told about the misconduct of these officers and all of the drug and drinking on the campus at night.

I, Officer Jeffrey Baker, am no longer working at Fisk University. I intended to file discrimination charges regarding Officer Binkley's conduct with the EEOC, but I choose not to due to my religion. I am a pastor.

Black officers have complained about Officer Binkley's racial slurs toward anybody that worked with her on the night shift to Chief Mickey West, Human Resources and even the new President. Officer Binkley continued to work there even after my departure from Fisk Commander Timmy Wells continued to work knowing that he had been reported a few times for being at work smelling like marijuana.

I, Officer Jeffrey Baker, certify that the above information is true.

JEFFERY BAKER

**Print Name**

Address: _P.O. BOX 68062 NASHVILLE TN 37206_

*Jeffry Bak.*

**Signature**

Email: _____

_10-19-2014_

**Date**

Phone#: _615) 568-8927_

TIME SENSITIVE REQUEST FOR SEPARATION INFORMATION

FISK UNIVERSITY
1000 17TH AVE N
NASHVILLE, TN 37208

SSN: 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
BYE: 03/08/2014

CLAIM EFFECTIVE DATE: 03/11/2013
DATE MAILED: 03/12/2013
RESPONSE DUE DATE: 03/19/2013

WILSON, KENNETH

12. Describe what the prior incident warning said.

*Letter of Counseling (Failure to Interact Collegially with Students)*

13. What is the name and title or position of the person who discharged the claimant?

Name *Steven Hope*

Title or Position *Commander*

14. What were the standards expected of the claimant?

*Refrain from using abusive language toward students*

15. Did the claimant ever meet the standards? ☑YES ☐NO

16. Did the claimant make any attempt to conform to the standards? ☑YES ☐NO